**NATIONAL SILVER COMPANY**

v.

**UNITED STATES.**

**C.D. 4582; Court No. 67/52855–89912.**

United States Customs Court.
Jan. 29, 1975.

Barnes, Richardson & Colburn, New York City (Peter J. Fitch, New York City, of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen. (Velta A. Melnbrencis, New York City, trial attorney), for defendant.

NEWMAN, Judge:

Plaintiff has moved for summary judgment, and defendant has filed a cross-motion for judgment on the pleadings. We are faced with an issue concerning the validity of the rate-quota provisions under which the district director at the port of Los Angeles assessed duty upon certain stainless steel knives and forks imported by plaintiff from Japan in February 1965.

Plaintiff's protest is directed against the assessment of duty under item 927.-53 of the Tariff Schedules of the United States (TSUS) at the rate of 3 cents each plus 67.5 per centum ad valorem. It is claimed that the knives and forks in question are properly dutiable under items 650.09 and 650.39, TSUS, at the rate of 1 cent each plus 12.5 per centum ad valorem.

For the reasons indicated hereinafter, plaintiff's motion is granted.

## THE FACTS

Admittedly, there is no genuine issue as to any material fact.

On January 10, 1958 and January 31, 1958 the United States Tariff Commission (now United States International Trade Commission) submitted to the President a report on its findings and recommendations in the Commission's "escape-clause" investigation (No. 61) of stainless steel table flatware, conducted under section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. § 1364 (1958)). The Commission unanimously found and reported that as a result, in part, of concessions granted in the General Agreement on Tariffs and Trade (GATT), stainless steel table flatware classifiable under paragraphs 339 and 355 of the Tariff Act of 1930 were being imported into the United States in such increased quantities, both actual and relative, as to cause serious injury to the domestic industry producing like products. To remedy such injury, three of the commissioners recommended that the GATT concessions be withdrawn on stainless steel table flatware valued under $3 per dozen pieces, and that such flatware be subject to the statutory rates of duty originally established therefor by the Tariff Act of 1930. The other three commissioners recommended that the GATT concessions be withdrawn on the stainless steel table flatware "regardless of value" and be subject to the statutory rates originally established in the Tariff Act of 1930.[1] Thereafter and on July 24, 1959, the Commission submitted a supplemental report to the President. In neither of its reports did the Commission recommend that a rate quota be imposed, nor that the flatware in question be subjected to duty rates 50 percent higher than the original 1930 Tariff Act rates.

On October 20, 1959, however, the President in Proclamation No. 3323, T. D. 54969, announced that he concurred with the Commission's finding of serious injury, and established an annual rate quota beginning November 1, 1959 on imports of table spoons, table knives and table forks, wholly of metal and in chief value of stainless steel, not over 10.2 inches in over-all length and valued under $3 per dozen pieces. Under the proclamation, the duties on imports within the quota, which was fixed at 69 million single units, remained unchanged at the GATT concessions rates. The proclaimed rates applicable to imports in excess of the quota were 50 percent higher than the 1930 statutory rates.

Presidential Proclamation 3548 of August 21, 1963 (28 Fed.Reg. 9279) put the Tariff Schedules of the United States into effect, including the temporary modifications set forth in part 2 of the Appendix to the Tariff Schedules. The quota arrangement imposed by Proclamation 3323 was carried over into the temporary modifications which included, among other things, knives, forks and spoons, valued under 25 cents each, not over 10.2 inches in over-all length, and with stainless steel handles (provided for in items 650.09, 650.11, 650.39, 650.41, etc.). Knives and forks not exceeding 69 million single units entered in any 12-month period beginning November 1 in any year were covered under items 927.50 and 927.51, set forth in said part 2. Over-quota imports of such knives and forks were covered under item 927.53, set forth in said part 2, and were to be assessed with duty at the rate of 3 cents each plus 67.5 per centum ad valorem.

The imported knives are of the type provided for by item 650.09, TSUS; and the imported forks are of the type provided for by item 650.39, TSUS. Such knives and forks were imported in excess of the quota provided for in item 927.53, TSUS, and hence were assessed with duty at the rate of 3 cents each plus 67.5 per centum ad valorem under that provision.

## CONTENTIONS OF THE PARTIES

Citing United States v. Schmidt Pritchard & Co. et al., 47 CCPA 152, C.A.D.

1. See 19 U.S.C. § 1330(d) (1958) respecting "Effect of divided vote in certain cases", and the discussion in footnote 7.

750 (1960), cert. denied, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960), plaintiff contends that Proclamation 3323 is void since it established escape-clause remedies other than those recommended by the Tariff Commission, in violation of section 7(c) of the Trade Agreements Extension Act of 1951, as amended.

Additionally, plaintiff insists that the 1958 amendments to the Trade Agreements Extension Act of 1951 did not change the President's authority under section 7(c), but simply gave Congress authority to act if the President saw fit not to do so.

Finally, plaintiff argues that "[i]tems 927.50 through 927.54 of TSUS are the embodiment and implementation of Proclamation 3323 in the transition from the schedules of the Tariff Act of 1930 to the Tariff Schedules of the United States. If Proclamation 3323 is illegal, null and void, then said items 927.50 through 927.54, being based upon a void proclamation, are similarly void". Thus, plaintiff claims that the imported knives are properly dutiable at the rate of 1 cent each plus 12.5 per centum ad valorem under item 650.09, TSUS; and that the forks are properly dutiable at the rate of 1 cent each plus 12.5 per centum ad valorem under item 650.39, TSUS.

Defendant contends that *Schmidt Pritchard* is not applicable to section 7(c) of the Trade Agreements Extension Act of 1951, as amended by section 6 of the 1958 Act, since, it is argued, the 1958 Act did not require the President merely to accept or reject a Tariff Commission recommendation, but permitted him to approve such recommendation "in part". Further, defendant asserts: "Congress's failure to take action pursuant to section 7(c)(2)(B) of said Act is tantamount to Congress's acquiescence in, and ratification of, the President's action".

Finally, in support of the assessment herein, defendant argues that items 927.50 through 927.54, TSUS, were the result of a statutory scheme initiated by Congress with the Customs Simplification Act of 1954, 68 Stat. 1136, as amended, and culminating with Presidential Proclamation No. 3548, whereby all permanent and temporary tariff provisions were transferred into the Tariff Schedules of the United States; and that "[a]ny defect, either arising out of Presidential Proclamation No. 3323, or out of the Tariff Commission's actions in transferring over to the Tariff Schedules, was remedied by the Tariff Classification Act of 1962, 76 Stat. 72, which mandated the President to publish and proclaim the Tariff Schedules, including the temporary modifications contained therein".

## STATUTES

The so-called "escape-clause" provisions, section 7 of the Trade Agreements Extension Act of 1951, 65 Stat. 74, so far as pertinent, read:

*Sec. 7.* (a) * * *

 * * * * * *

Should the Tariff Commission find, as a result of its investigation and hearings, that a product on which a concession has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, *it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas*, to the extent and for the time necessary to prevent or remedy such injury. * * * [Emphasis added.]

(c) Upon receipt of the Tariff Commission's report of its investigation and hearings, *the President may make such adjustments in the rates of duty, impose such quotas, or make such other modifications as are found and reported by the Commission* to be necessary to prevent or remedy serious injury to the respective domestic

industry. If the President does not take such action within sixty days he shall immediately submit a report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate stating why he has not made such adjustments or modifications, or imposed such quotas. [Emphasis added.]

Section 6 of the Trade Agreements Extension Act of 1958, 72 Stat. 676, provides:

Sec. 6. Subsection (c) of section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C., sec. 1364(c)), is amended by inserting "(1)" after "(c)" at the beginning thereof, and by adding at the end thereof the following:

(2) The action so found and reported by the Commission to be necessary shall take effect (as provided in the first sentence of paragraph (1) or in paragraph (3), as the case may be) —

(A) if approved by the President, or

(B) if disapproved by the President in whole or in part, upon the adoption by both Houses of the Congress (within the 60-day period following the date on which the report referred to in the second sentence of paragraph (1) is submitted to such committees), by the yeas and nays by a two-thirds vote of each House, of a concurrent resolution stating in effect that the Senate and House of Representatives approve the action so found and reported by the Commission to be necessary.

For the purposes of subparagraph (B), in the computation of the 60-day period there shall be excluded the days on which either House is not in session because of an adjournment of more than 3 days to a day certain or an adjournment of the Congress sine die.

(3) In any case in which the contingency set forth in paragraph (2)(B) occurs, the President shall (within 15 days after the adoption of such resolution) take such action as may be necessary to make the adjustments, impose the quotas, or make such other modifications as were found and reported by the Commission to be necessary.

Sections 101, 102 and 103 of the Tariff Classification Act of 1962, Public Law 87–456, 76 Stat. 72 et seq., as amended by the Trade Expansion Act of 1962, Public Law 87–794, 76 Stat. 872, provide:

### Title I—Adoption of Revised Tariff Schedules

Sec. 101. (a) The Tariff Act of 1930, as amended, is amended by striking out titles I and II (19 U.S.C. 1001 and 1201) and, subject to subsection (b) of this section and to sections 102 and 103 of this Act, by substituting in lieu thereof a new title I entitled "Title I—Tariff Schedules of the United States".

(b) Such new title I (hereinafter in this Act referred to as the "Tariff Schedules of the United States") shall consist of—

(1) the general headnotes and rules of interpretation;

(2) schedules 1 to 8, inclusive; and

(3) the appendix to the tariff schedules;

all as set forth in the report of the United States Tariff Commission (hereinafter in this Act referred to as the "Commission") entitled "Tariff Classification Study, Proposed Revised Tariff Schedules of the United States", dated November 15, 1960, as changed by the "First Supplemental Report" (January, 1962); and

(4) subject to subsection (c), such changes in the provisions identified in paragraphs (1), (2), and (3) of this subsection as the Commission decides —

(A) are necessaary to reflect changes in tariff treatment made by statute

or under authority of law, arising either before the date of the enactment of this Act [May 24, 1962] or on or after such date of enactment and before the date on which the Tariff Schedules of the United States is published pursuant to subsection (d), or

(B) are otherwise necessary.

\* \* \* \* \* \*

Sec. 102. At the earliest practicable date, the President shall take such action as he deems necessary to bring the United States schedules annexed to foreign trade agreements into conformity with the Tariff Schedules of the United States and, after such action is completed, the President shall proclaim—

(1) the rates of duty in rate column numbered 1 of schedules 1 to 7, inclusive, and the other provisions of the Tariff Schedules of the United States, which are required or appropriate to carry out the foreign trade agreements to which the United States is a contracting party;

(2) the temporary modifications set forth in part 2 of the appendix to the tariff schedules (that is, those modifications proclaimed pursuant to the provisions of section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. 1364), and of other trade-agreements legislation);

(3) the additional import restrictions set forth in part 3 of the appendix to the tariff schedules (that is, those restrictions proclaimed pursuant to section 22 of the Agricultural Adjustment Act, as amended (7 U.S.C. 624)); and

(4) the nations or areas and countries set forth in general headnote 3(d) of the Tariff Schedules of the United States \* \* \*.

Sec. 103. The provisions of the Tariff Schedules of the United States as made effective on the date provided by section 501 shall have the status of statutory provisions duly enacted by the Congress, except for—

(1) the rates of duty in rate column numbered 1 of the tariff schedules proclaimed pursuant to paragraph (1) of section 102 which are lower than the rates of duty in rate column numbered 2 of such schedules for the corresponding items; and

(2) the provisions proclaimed by the President pursuant to paragraphs (2), (3), and (4) of section 102.

The applicable provisions of the Tariff Schedules of the United States are:

*Schedule 6.—Metals and Metal Products*

\* \* \* \* \* \* \* \* \*

*Part 3.—Metal Products*

\* \* \* \* \* \* \* \* \*

Subpart E. Tools, Cutlery, Forks and Spoons

\* \* \* \* \* \* \* \*

Knives not specifically provided for elsewhere in this subpart, and cleavers, with or without their handles:

\* \* \* \* \* \* \* \*

Knives with their handles:

\* \* \* \* \* \* \* \*

With stainless steel handles:

650.09 With handles not containing nickel and not containing over 10 percent by weight of manganese .............................. 1¢ each + 12.5%' ad val.

\* \* \* \* \* \* \* \* \*

Forks, spoons, and ladles, all the foregoing which are kitchen or table ware, with or without their handles:

Forks:

\* \* \* \* \* \* \* \*

With their handles:

\* \* \* \* \* \* \* \*

With stainless steel handles:

650.39 With handles not containing nickel and not containing over 10 percent by weight of manganese ......................... 1¢ each + 12.5% ad val.

\* \* \* \* \* \* \* \* \*

*Appendix to the Tariff Schedules*

\* \* \* \* \* \* \* \* \*

*Part 2.—Temporary Modifications Proclaimed Pursuant to Trade-Agreement Legislation*

\* \* \* \* \* \* \* \* \*

Subpart A. Escape-Clause Actions

*Subpart A headnotes*:

1. This subpart contains the temporary modifications of the provisions of the tariff schedules proclaimed by the President pursuant to the escape-clause procedures prescribed in section 7 of the Trade Agreements Extension Act of 1951, as amended, or in sections 301 and 351 or 352 of the Trade Expansion Act of 1962.

\* \* \* \* \* \* \* \* \*

Knives, forks, and spoons, all the foregoing valued under 25 cents each, not over 10.2 inches in over-all length, and with stainless steel handles (provided for in items 650.09, 650.11, 650.39, 650.41, and 650.55 of part 3E of schedule 6, or if included in sets provided for in item 651.75 of such part):

For an aggregate quantity not to exceed 69 million single units entered in any 12-month period beginning November 1 in any year from countries subject to the rates set forth in rate of duty column numbered 1:

\* \* \* \* \* \* \* \* \*

Other:

927.53 Knives and forks (items 650.09, 650.11, 650.39, and 650.41) ......................... 3¢ each + 67.5% ad val.

PRESIDENTIAL PROCLAMATION
3323 (T.D. 54969)

The proclamation, in pertinent part, provides:

1. WHEREAS, pursuant to the authority vested in him by the Constitution and the statutes, including section 350 of the Tariff Act of 1930, as amended (19 U.S.C. § 1351), on October 30, 1947, the President entered into a trade agreement with certain foreign countries, which trade agreement consists of the General Agreement on Tariffs and Trade * * *

* * * * * *

7. WHEREAS the United States Tariff Commission on January 10, 1958 and January 31, 1958 submitted to me a report (which report the Commission on July 24, 1959 supplemented in accordance with my request) of its investigation No. 61 under section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. § 1364), on the basis of which investigation, and a hearing held in connection therewith, the Commission has found that, as a result in part of the duties reflecting the concessions granted thereon in the said General Agreement, as supplemented, the products referred to in the fourth recital of this proclamation (hereinafter sometimes referred to as "stainless steel table flatware") were being imported into the United States in such increased quantities, both actual and relative, as to cause serious injury to the domestic industry producing like products;

8. WHEREAS I find that in order to remedy the serious injury to the domestic industry it is necessary that there be applied to stainless steel table flatware not over 10.2 inches in over-all length and valued under $3 per dozen pieces the customs treatment hereinafter proclaimed;

9. WHEREAS section 350 of the Tariff Act of 1930, as amended, authorizes the President to proclaim such modifications of existing duties and such additional import restric-

tions as are required or appropriate to carry out any foreign trade agreement that the President has entered into under such section 350; and

10. WHEREAS, upon modification of the concessions as hereinafter proclaimed, it will be appropriate, to carry out the said General Agreement, to apply to the stainless steel table flatware not over 10.2 inches in over-all length and valued under $3 per dozen pieces the customs treatment hereinafter proclaimed:

NOW, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under the authority vested in me by section 350 of the Tariff Act of 1930, as amended, and by section 7(c) of the Trade Agreements Extension Act of 1951, as amended, and in accordance with the provisions of Article XIX of the said General Agreement, do proclaim that, effective November 1, 1959, and until the President otherwise proclaims—

(a) the said prevailing tariff concessions granted in the said General Agreement, as supplemented, are hereby modified by adding the following proviso at the end of item 339 in Part I of Schedule XX–1956:

"*Provided,* That after there has been entered, in any 12-month period beginning November 1, in 1959 and in each subsequent year, a total aggregate quantity of 69 million single units of table spoons wholly of metal and in chief value of stainless steel, not over 10.2 inches in over-all length and valued under $3 per dozen pieces included in this item 339, and of table knives and table forks of like composition, length, and value, included in item 355 of Schedule XX annexed to the Torquay Protocol to the General Agreement on Tariffs and Trade, the rates on the products described above in this proviso, entered during the remainder of such 12-month period, shall be as follows:"

* * * * * *

## VALIDITY OF PROCLAMATION 3323 UNDER THE TRADE AGREEMENTS EXTENSION ACT OF 1951, AS AMENDED

 It is fundamental that Congress is vested by the Constitution with authority to levy duties on imported goods. And it is also well settled that Congress may endow the President with power to raise or lower rates of duty provided he acts within the procedures authorized by Congress. J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); United States v. George S. Bush & Co., Inc., 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940). I agree with plaintiff's contention that Proclamation 3323 is void since the President failed to follow the procedures authorized by Congress for escape-clause [2] action pursuant to section 7(c) of the Trade Agreements Extension Act of 1951, as amended.

Under section 7(a) of the 1951 Act, as amended, the Tariff Commission after a determination of injury must recommend to the President respecting a concession previously granted: "the withdrawal or modification of the concession, its suspension in whole or in part, or *the establishment of import quotas*". [Emphasis added.] Under section 7(c) "the President may make such adjustments in the rates of duty, *impose such quotas,* or make such other modifications *as are found and reported by the Commission to be necessary* to prevent or remedy serious injury to the respective domestic industry". [Emphasis added.] Accordingly, under section 7 "the establishment of import quotas" is one of the escape-clause remedies the Tariff Commission is expressly authorized to recommend to the President; and the quota is an escape-clause remedy the President is expressly authorized to impose, provided that such action was "found and reported by the Commission to be necessary".

In short, by Proclamation 3323 the President totally rejected the Commission's recommendation to withdraw GATT concessions and restore the original statutory rates under the Tariff Act of 1930. Acting entirely on his own initiative, the President imposed a rate quota permitting importations of quota-type flatware at the *concession rates* prior to filling the quota, and subsequently at rates *50 percent higher than the 1930 rates*. Plaintiff argues that under these circumstances, Proclamation 3323 is illegal, null and void, citing the significant holding in United States v. Schmidt Pritchard & Co. et al., *supra* as dispositive of the issue herein involved.

In *Schmidt Pritchard*, it appears that in the course of an escape-clause proceeding under section 7, the President accepted the majority finding of the Tariff Commission respecting the existence of injury to the domestic bicycle industry as a result, in part, of the duties reflecting concessions granted in the General Agreement on Tariffs and Trade, and that increases in rates of duty were necessary to remedy such injury. However, the President rejected the finding and recommendation respecting the amount of increase in duty necessary to remedy the injury, and thereupon proclaimed other rates of duty in Proclamation 3108. The appellee-importer contended, *inter alia*, that section 7(c) limited the President's discretion in action upon the Tariff Commission's report to acceptance or rejection of the remedies recommended by it and, therefore, Proclamation 3108 was invalid.

The Court of Customs and Patent Appeals determined that insofar as Proclamation 3108 set a rate of duty on one class of bicycles different from that rec-

---

2. "The 'escape-clause' is a clause inserted in trade agreements allowing parties to the agreement to escape from terms of the agreement which cause or threaten serious injury to domestic industry, which effect was unforeseen at the time of the agreement. The statutory procedure may be applied only in cases where the involved trade agreement contains such an 'escape-clause.' In this case the escape-clause involved is that in GATT, 61 Stat. (Part 5) A 59". United States v. Schmidt Pritchard & Co. et al., 47 CCPA 152, 159, C.A.D. 750 (1960), cert. denied, 364 U.S. 919, 81 S.Ct. 283, 5 L.Ed.2d 259 (1960).

ommended by the Tariff Commission, the President exceeded his authority under the escape-clause procedures of section 7 of the 1951 Act, as amended, and consequently that portion of the proclamation was held void. In this connection, our appellate court commented (47 CCPA at 159–160):

> Appellee contended and the Customs Court found that the proclamation with respect to the large wheel lightweight bicycles were outside the authorization given by the statute in that it proclaimed an adjustment in the rate of duty other than that recommended by the Tariff Commission. The specific language of the statute pertinent to this issue is, "the President may make *such adjustments in rates of duty, * * * as are found and reported by the Commission* to be necessary to prevent or remedy serious injury * * *." [Emphasis added.] The clear import of this language is that the President *may* proclaim adjustments in rate of duty, but he need not do so. The alternative of disregarding the recommendation and making no changes in existing rates is open to the President. However, if the President decides to make an adjustment in rate of duty, he must proclaim the change which is recommended to him by the Tariff Commission.

Appellant correctly emphasizes that section 7 of the Trade Agreements Extension Act of 1951 is primarily a procedural statute. This statute, commonly referred to as the "escape-clause" provision, defines the manner in which the President must exercise existing powers.

Congress has fixed in section 7 of the Trade Agreements Extension Act of 1951 the limits on the Presidential exercise of the therein delegated powers. He is authorized only to accept or reject the recommendations of the Tariff Commission made pursuant to this section. Were it otherwise, the procedures set up in section 7 would be meaningless. For this reason, we do not agree with the position of counsel for appellant that Congress, in addition, intended that the President should have greater discretion and authority under other statutes to achieve the same objectives. Be that as it may, we know of no other statutory provisions by which the President may effect "escape-clause" adjustments and counsel have cited none. [Footnote references omitted.]

■ The present case is identical to the situation in *Schmidt Pritchard* insofar as the President imposed an escape-clause remedy other than that recommended by the Tariff Commission. Accordingly, Proclamation 3323 exceeded the President's authority under section 7(c) of the 1951 Act, thus rendering such proclamation *ultra vires* and void.

## VALIDITY OF PROCLAMATION 3323 UNDER THE TRADE AGREEMENTS EXTENSION ACT OF 1958

Defendant argues that in *Schmidt Pritchard* the appellate court construed section 7(c) of the Trade Agreements Extension Act of 1951, as amended by the 1953 and 1955 Acts, while Proclamation 3323 was issued after the enactment of the Trade Agreements Extension Act of 1958.[3]

■ Relying heavily upon the newly added subsection 7(c)(2)(B) and focusing upon the phrase therein "in whole or in part", defendant argues that "the 1958 Act effected a change from the prior limitation on Presidential action which the *Schmidt Pritchard* court had found included in the 1951, 1953, and 1955 Acts". In short, defendant tacitly admits that in Proclamation 3323 the President exceeded his authority under section 7(c) of the 1951 Act, as amended

3. The 1951 Act, as amended in 1953 and 1955, was in effect at the time the Tariff Commission made its investigation No. 61 and issued its report on January 10, 1958 and January 31, 1958. The 1958 Act, enacted on August 20, 1958, was in effect on the dates of the Commission's supplemental report of July 24, 1959 and Proclamation 3323.

in 1953 and 1955, but urges that the President's action was authorized under section 7(c)(2)(B) of the 1951 Act, as amended by the 1958 Act. In essence, defendant's position is that under the 1958 amendment the President had authority to disapprove the recommendations of the Commission "in part", and implement his own escape-clause remedy.

Defendant's contention is entirely without merit for these reasons:

First, I find that there was no disapproval "in part" of the Commission's recommendations. In its reports on investigation No. 61, there were only two recommendations of the commissioners. An examination of these reports discloses that three commissioners recommended the total withdrawal of concessions on flatware valued under $3 per dozen pieces, whereas the other three commissioners recommended the total withdrawal of concessions "regardless of value"[4] Disregarding the difference between the two recommendations predicated upon value, there was in substance only one recommendation of the Commission—the total withdrawal of the concessions granted in GATT. However, contrary to the Commission's recommendation to withdraw the GATT concessions, the Presidential proclamation imposed a rate quota permitting up to 69 million pieces of the described flatware to be imported each year (commencing November 1, 1959) at the GATT concessions rates. Moreover, an over-quota importations, such as those involved in this case, the proclamation imposed a duty 50 percent higher than the original 1930 statutory rates the Commission had recommended. Plainly, then, the President's escape-clause remedies bore no relationship whatsoever to the recommendations "found and report-ed by the Commission to be necessary", and in effect constituted a *total rejection* of the Commission's recommendations.

Notwithstanding that the President did not take the action recommended by the Commission, his identical letters to the chairmen of the House Ways and Means Committee and the Senate Finance Committee advising them of his imposition of a rate quota made no reference to the action recommended by the Commission to be necessary (viz., withdrawal of GATT concessions); nor did the President's letters state any reasons why he did not take the action recommended by the Commission, as required by section 7(c)(1).[5] In brief, the letters to the Congressional committees gave Congress no indication of any disapproval, in whole or in part, by the President of the Commission's recommendations in its investigation No. 61.

Secondly, even assuming *arguendo* that, as defendant urges, there was a disapproval "in part" of the Commission's recommendations, section 7(c)(2)(B) must be read in *pari materia* with section 7(c)(1) and should not be construed so as to nullify the manifest Congressional intent to limit the president's discretion to "impose such quotas * * * *as are found and reported by the Commission to be necessary"*. It may be emphasized that the 1958 Act retained the identical language of section 7(c) of the 1951 Act, as amended in 1953 and 1955, which significantly, was construed in *Schmidt Pritchard* to limit the President's discretion to either accept or reject the Commission's recommendations.[6] The 1958 Act merely redesignated section 7(c) of the 1951 Act, as amended in 1953 and 1955, as section 7(c)(1), and added a new

---

4. See footnote 1.

5. Section 7(c)(1) provides in relevant part: " * * * * If the President does not take such action [as was recommended by the Tariff Commission] within sixty days *he shall immediately submit a report* to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate *stating why he has not made such adjustments or modifications*, or imposed such quotas". [Emphasis added.]

6. Indeed, in *Schmidt Pritchard*, the appellate court focused particularly upon the language of section 7(c) of the 1951 Act, as amended, "such adjustments in the rates of duty, * * * as are found and reported by the Commission".

subsection 7(c)(2), providing *inter alia* that whenever the President disapproved of the Tariff Commission's escape-clause recommendations (in whole or in part), the Commission's recommendations would still be adopted if Congress approved by a two-thirds vote of each House a concurrent resolution to that effect.

The Report of the House Committee on Ways and Means explaining the bill that later became the 1958 Act (H.R. Rep. No. 1761, 85th Cong., 2d Sess. (1958)) indicates that under section 7(c)(2), whether it is the President (by proclamation) or the Congress (by the concurrent resolution procedure) which invokes escape-clause action after a Tariff Commission's finding of injury, it is only "the action so found and reported by the Commission to be necessary" that may take effect. Thus, the report states (p. 2):

A. *Principal features of H.R. 12591*

&ast; &ast; &ast; &ast; &ast; &ast;

3. The escape-clause procedure is retained and will be applicable to new as well as old concessions, with the following modifications in the procedure:

&ast; &ast; &ast; &ast; &ast; &ast;

(*f*) When the President disapproves in whole or in part a Tariff Commission recommendation in an escape-clause case, the committee bill provides that effect shall be given to *any part of the recommendations which has not been made effective,* if there is approved, within 60 days of the submission of the report of the President's disapproving action, a concurrent resolution by a two-thirds vote of both Houses of the Congress. &ast; &ast; &ast; [Emphasis added.]

And at page 10:

### CONCURRENT RESOLUTION IN ESCAPE–CLAUSE CASES

Under existing law, upon receipt of the Tariff Commission's report of its investigation and hearings in escape-clause cases, the President may make such adjustments of duty, impose such quotas, or make such other modifications as are found and reported to be necessary to prevent or remedy serious injury to the domestic industry. If he does not take such action within 60 days he must report to the Committee on Ways and Means of the House and to the Committee on Finance of the Senate why he has not done so. While the Congress has the power to pass a bill which would have the effect of reversing the President's action where he disapproves a Tariff Commission recommendation, and to override a veto of such a bill if it is disapproved by the President, no such action has ever been taken since the escape-clause provision was first enacted in 1951.

Your committee has adopted two important amendments, contained in sections 6 and 7 of the bill, to the escape-clause procedure.

Section 6 provides that *the action found and reported by the Tariff Commission to be necessary* to remedy serious injury shall take effect, if disapproved by the President in whole or in part, in the event that, within the 60-day period following the President's report stating why he has not taken the action, the Congress, by a two-thirds vote of each House, adopts a concurrent resolution stating in effect that it approves the action found and reported by the Tariff Commission to be necessary. If the Congress adopts such a resolution, the President shall, within 15 days thereafter, take such action as may be necessary to make the adjustments, impose the quotas, or make such other modifications *as were found and reported by the Commission to be necessary* to prevent or remedy serious injury. This will enable the President to take the necessary action internationally under United States trade agreements. [Emphasis added.]

While there can be no doubt from the legislative history of the 1958 Act that

Congress intended "that the President should have discretion to consider whether in his opinion the recommendations [of the Tariff Commission] are soundly based and to take into consideration other matters, such as the effect of the proposed action on foreign relations",[7] yet there is not even a glimmer of a suggestion that by using the words "in whole or in part" Congress intended thereby to expand the President's authority in escape-clause actions by giving him carte blanche to digress from the action recommended by the Tariff Commission.

■ From a study of the legislative history of the 1958 Act, I have concluded that the newly added concurrent resolution procedure in subsection 7(c)(2)(B) was intended only to provide Congress with an expeditious means of overriding a Presidential disapproval (in whole or in part) of the Tariff Commission's recommendations in an escape-clause proceeding. Presumably, if Congress wished to invoke an escape-clause remedy *not recommended by the Commission,* it would, as before the 1958 Act, be required to enact a bill in the usual manner. Inasmuch as the legislative history of the 1958 Act establishes that by the concurrent resolution procedure Congress intended to simplify the legislative process by which it could implement the Commission's recommendations, I can perceive of no reason why it would have intended to confine itself to a narrower scope of action than was open to the President. On the contrary, it is my considered view that Congress never intended that the President should act outside of the remedies recommended by the Commission; and that by adding subsection 7(c)(2)(B) Congress intended to give itself the same scope of action which it believed that it had given the President under section 7(c)(1).

In sum, then, the reference in the new subsection to disapproval "in whole or in part" plainly did not remove the limitation on the President's authority in section 7(c)(1) to approve or disapprove the recommendations of the Commission, as construed by our appellate court in *Schmidt Pritchard.*

Continuing, defendant also argues that: "Congressional failure to proceed under the new procedure, i. e., section 7(c)(2)(B), *supra,* amounts to a Congressional acquiescence in, and ratification of, the President's partial disapproval of the Tariff Commission's recommendation as promulgated in Proclamation No. 3323". In this connection, it must be observed that prior to enactment of the concurrent resolution procedure in section 7(c)(2)(B), Congress could, by enactment of a bill following the President's notification to the Congress of his disapproval of a Tariff Commission recommendation, override the President's action. Hence, while simplifying the procedure by which Congress might implement a recommendation of the Commission rejected by the President, the 1958 Act did not newly create authority to override the President's disapproval. However, as pointed out in H.R.Rep. No. 1761, at page 10, Congress had never reversed by legislation a Presidential disapproval of a Commission recommendation. Consequently, could it not be said that by failing to enact bills overriding the President's illegal action on spring clothespins in Proclamation 3211, 92 Treas. Dec. 322, T.D. 54493 (subsequently held invalid in Falcon Sales Company et al. v. United States, 47 Cust.Ct. 129, C.D. 2292 (1961)) or his *ultra vires* action on bicycles in Proclamation 3108, 90 Treas. Dec. 285, T.D. 53883 (subsequently declared invalid in *Schmidt Pritchard*), Congress had thus ratified the President's action? I think not. It is

---

7. H.R.Rep.No.1761, 85th Cong., 2d Sess., p. 8 (1958). Thus, pursuant to 19 U.S.C. § 1330(d) (effect of divided vote of Tariff Commission) the President had discretion to follow one of three courses of action: (1) withdraw concessions as to flatware valued under $3 per dozen pieces, as three of the commissioners recommended; or (2) withdraw concessions on the flatware regardless of value, as the other three commissioners recommended; or (3) disapprove the commissioners' recommendation to withdraw the GATT concessions.

stressed that Congress had the power through enactment of legislation to nullify the President's unauthorized digressions from the recommendations of the Tariff Commission in both Proclamations 3108 and 3211, but it failed to do so. Yet, in neither *Falcon Sales* nor in *Schmidt Pritchard* did the courts hold that congress' failure to act constituted a ratification of the President's invalid action!

█ While Congressional inaction following submission of a report of Presidential disapproval (in whole or in part) of the Commission's recommendations [8] would plainly indicate Congress' concurrence with the President in such *disapproval*, mere inaction, however, will not be further construed as a Congressional ratification of or acquiescence in Presidential escape-clause action taken contrary to the procedures established by Congress in section 7. In light of the extremely serious nature of escapes from international obligations,[9] and the complex procedures adopted by Congress for escape-clause actions, mere Congressional inaction under section 7(c)(2)(B) will not lightly be inferred as a ratification of or acquiescence in unauthorized Presidential action. This is especially true where, as here, the President's report to the appropriate Congressional committees failed to state the fact of and the reasons for disapproving the action recommended by the Commission. Therefore, I see no merit in defendant's contention that by inaction Congress has approved the rate-quota arrangement provided in Proclamation 3323.

While not articulated as such, defendant also relies upon the doctrine of legislative ratification of executive (or administrative) interpretation. See e. g., *Schmidt Pritchard, supra;* and Greene

Cattle Company, Inc. v. United States, 36 CCPA 52, C.A.D. 397 (1949). Hence, defendant contends that when Congress enacted the 1958 Act, it had knowledge of the President's interpretation of his authority under section 7 of prior acts (viz., 1951, 1953, 1955) in certain pre-1958 escape-clause proclamations, and therefore Congress must be deemed to have ratified such interpretation by passage of the 1958 Act.

Strongly militating against the application of the ratification doctrine in this case is the legislative history of the escape-clause procedure as summarized in *Schmidt Pritchard* (47 CCPA at 161–162):

Prior to enactment of the first "escape-clause" procedure in the Trade Agreements Extension Act of 1951, 65 Stat. 72, the procedure for invoking the escape-clause was set forth in Executive Order No. 9832, 12 Fed.Reg. 1363. The Executive Order procedure made the recommendations of the Tariff Commission subjects for the President's consideration but the ultimate action was left entirely to the discretion of the President. *However, Congress found that procedure to be unfair, ineffective, and unworkable.* Two amendments were introduced in the House, one by Mr. Curtis, which would have enacted the existing procedure, and one by Mr. Bailey, which made the recommendations of the Tariff Commission binding upon the President. Mr. Curtis' amendment was rejected, and Mr. Bailey's amendment was passed by the House.

The Senate Finance Committee redrafted the "escape-clause" procedure into substantially its present form. This form of procedure was a compromise, in that it did not bind the Presi-

---

8. As noted *supra*, the President's letters to the Congressional committees gave Congress no indication of any disapproval of the Commission's recommendations in its investigation No. 61, as required by section 7(c)(1).

9. " * * * [I]t is the opinion of your committee [House Ways and Means] that escape actions should not be lightly undertaken, involving as they do not only the in-

terests of American businessmen and consumers, and of other American producers who may lose the benefit of the compensatory concessions which were reciprocally granted to the United States by foreign countries, but also the foreign relations of the United States to a serious degree". H. R.Rep.No.1761, 85th Cong., 2d Sess. (1958), p. 12.

dent to proclaim every recommendation. However, it did not give the President discretion to proclaim any other modification. With some amendments not pertinent here, the Senate Finance Committee amendment was reported out of Conference Committee and passed by Congress.

In the Trade Agreement Extension Acts of 1953 and 1955 substantially the same language is found. In each of those years, however, Congress again rejected amendments which would have made the recommendations of the Tariff Commission binding upon the President, *and also rejected amendments which would have left the President the same discretion as he had prior to 1951.* [Footnote references omitted; emphasis added.]

■ In the foregoing summary of the legislative history of the 1951, 1953 and 1955 Acts, it is important to note that Congress considered granting the President the broad authority he had possessed prior to 1951, but repeatedly rejected granting the President such authority. Thus, it would be entirely unrealistic to presume that in enacting the 1958 Act, Congress intended, in effect, to revive the "Executive Order procedure" which it had theretofore found "to be unfair, ineffective, and unworkable".

Additionally, with respect to the pre-1958 escape-clause proclamations it is not clear whether, or to what extent, any Presidential interpretation of *section 7* was involved in deviating from the Commission's recommendations. For example, respecting the spring clothespin proclamation involved in *Falcon Sales*, defendant there argued that by substituting a duty increase for the absolute quota recommended by the Commission, the President must be presumed to have acted pursuant to his authority under section 350(a)(5) of the Tariff Act of 1930, as amended, rather than his authority under section 7. Again, in *Schmidt Pritchard*, the defendant urged that in proclaiming a different rate of duty on bicycles than was recommended by the Commission, the President could have invoked section 350(a).

■ In a word, while the 1958 Act obviously authorized the President to partially disapprove the recommendations of the Tariff Commission, the Act did not give him authority to go further and impose his own escape-clause remedies.

## VALIDITY OF ITEMS 927.50 THROUGH 927.54, TSUS

The Government insists that whether or not Presidential Proclamation 3323 is valid, items 927.50 through 927.54 were the result of a statutory scheme which produced the tariff schedules and therefore have been ratified by Congress. Defendant argues that: "[S]ince Congress is the one which establishes the escape-clause procedures to be followed by the President, it can ratify a Presidential action which fails to comply with such procedures. Where Congress mandates the President to proclaim the tariff schedules, including items 927.50 through 927.54, such ratification is implied. Moreover, escape-clause procedures merely define the manner in which the President to whom Congress has delegated certain powers must exercise them. Such procedures, therefore, need not be followed where Congress itself exercises the powers".

The Government further urges: "Congress must, therefore, be deemed to have known and considered the provisions of the [*Tariff Classification*] *Study* and to have adopted them in their entirety, thus ratifying any defects originally existing in the 'temporary modifications' contained in Part 2 of Schedule 9 [sic], found in the Appendix (*i. e.* Presidential Proclamation No. 3323), as well as any changes made in such modifications by the Tariff Commission".

True it is the Tariff Commission made a full and complete study of all the provisions of the United States customs laws and related special provisions pursuant to the Customs Simplification Act of 1954, as amended, and Congress had before it the *Tariff Classification Study* from November 15, 1960 until May 14, 1962, when it passed the Tariff Classifi-

cation Act of 1962. Moreover, it is undisputed that the procedures specified in the Tariff Classification Act of 1962 for the promulgation of the tariff schedules by the President were fully complied with, and that Proclamation 3548, effectuating the tariff schedules on and after August 31, 1963, is valid. Nonetheless, I am clear that in promulgating the tariff schedules the Congress did not intend to ratify any invalid escape-clause actions incorporated into the appendix or otherwise intend to exercise escape-clause powers.

First, neither the Customs Simplification Act of 1954, as amended, nor the Tariff Classification Act of 1962, pursuant to which Presidential Proclamation No. 3548 was proclaimed, contained escape-clause procedures or authority. Presidential Proclamation 3548 does not purport to be based upon any investigations or hearings for escape-clause purposes, nor does it purport to be authorized by section 7 of the Trade Agreements Extension Act of 1951, as amended.

Second, pursuant to sections 102 and 103 of the Tariff Classification Act of 1962 "those modifications proclaimed pursuant to the provisions of section 7 of the Trade Agreements Extension Act of 1951, as amended" (escape-clause actions), were expressly excepted from the "status of statutory provisions duly enacted by Congress". Hence, item 927.53, TSUS, was not accorded statutory effect, and is merely "the embodiment and implementation of proclamation 3323 in the transition from the schedules of the Tariff Act of 1930 to the Tariff Schedules of the United States". Charberjoy Distributors, Inc. v. United States, 65 Cust.Ct. 459, 462, C.D. 4123 (1970), aff'd, United States v. Charberjoy Distributors, Inc., 59 CCPA 207, C.A.D. 1068, 465 F.2d 922 (1972). In its *Tariff Classification Study*, the Tariff Commission informed Congress of the proposed Appendix to the Tariff Schedules, Part 2 (*Schedule 8.—Special Classifications Provisions Appendix to the Tariff Schedules*, 1960, pp. 114–115):

APPENDIX TO THE TARIFF SCHEDULES, PART 2—TEMPORARY MODIFICATIONS PROCLAIMED PURSUANT TO TRADE–AGREEMENTS LEGISLATION

Explanatory Notes

This part relates to temporary modifications of the basic schedules proclaimed by the President pursuant to trade-agreements legislation.

*Subpart A—Escape-Clause Actions*

Subpart A embraces modifications proclaimed pursuant to the escape-clause procedures prescribed in section 7 of the Trade Agreements Extension Act of 1951, as amended. The modifying provisions impose on certain articles increased import restrictions, in the form of higher rates of duty or of quantitative limitations (quotas).

The provisions incorporated in this subpart do not involve any significant changes in the substance of the existing escape-clause proclamations but do involve substantial simplification and clarification.

\*　　\*　　\*　　\*　　\*　　\*

Items 927.50 through 927.54 relate to the escape-clause action taken with respect to certain knives, forks, and spoons. The proposed provisions for knives and forks involve incidental rate changes compatible with those proposed in the permanent provisions in part 3E of schedule 6 by reason of the elimination of the existing distinction between knives and forks based on blade length. This change is not significant.

Moreover, headnote 1 of part 2, subpart A of the appendix provides:

1. This subpart contains the temporary modifications of the provisions of the tariff schedules proclaimed by the President pursuant to the escape-clause procedures prescribed in section 7 of the Trade Agreements Extension Act of 1951, as amended, or in sec-

tions 301 and 351 or 352 of the Trade Expansion Act of 1962.

And in 101 Treas.Dec. 100, T.D. 66-26, setting forth Presidential Proclamation 3697 of January 7, 1966, which *inter alia* purported to terminate Presidential Proclamation 3323, the then Commissioner of Customs stated:

> * * * Proclamation No. 3323 was reflected, with modifications, in items 927.50 through 927.54 of the Appendix to the Tariff Schedules of the United States.

Patently, then, Presidential Proclamation 3323 was never transmuted into an act of Congress, as were the permanent provisions of the TSUS.

 Nevertheless, defendant argues that the effect of not giving the temporary provisions in the appendix a statutory status "is merely to permit such temporary modifications to be subsequently changed, modified, or amended via Presidential proclamations issued pursuant to valid enabling legislation". While it is true, of course, that *an effect* of excepting escape-clause provisions from statutory status was to permit Presidential modification of such provisions by subsequent proclamations, *another effect* was that the temporary escape-clause provisions in the appendix never transcended their legal status as executive action, as was noted above. Accordingly, therefore, items 927.50 through 927.54, although incorporated (with minor modifications) into the Appendix to the Tariff Schedules,[10] have only the validity of the underlying Presidential proclamation, which I have de-

termined was invalid. Congressional ratification of defects in the prior escape-clause remedies invoked by the President should not be implied where, as here, the escape-clause actions were merely relegated by the Tariff Commission to an appendix to the proposed schedules (along with other temporary and collateral provisions), no public hearings were held by the Commission respecting the appendix,[11] and such provisions were expressly denied statutory status by Congress.

## CONCLUSION

 In sum, while it is true that the escape-clause provisions in Proclamation 3323 were incorporated into an Appendix to the Tariff Schedules, the proclamation of the schedules (including the appendix) did not alter the legal status of such provisions as escape-clause action taken pursuant to section 7 of the Trade Agreements Extension Act of 1951, as amended. Since Proclamation 3323 is invalid, *a fortiori* items 927.50 through 927.54, which are based upon that void proclamation, are similarly invalid. Consequently, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for judgment on the pleadings is denied.

The clerk of the court is directed to return to the district director of customs at the port of Los Angeles the entry and other official papers for reliquidation under the appropriate tariff items without regard for the provisions of items 927.50 through 927.54 of the Tariff Schedules of the United States.

---

10. In United States v. Charberjoy Distributors, Inc., 59 CCPA 207, 209, C.A.D. 1068, 465 F.2d 922 (1972), the court stated: "Item 927.43 [sic] is based on a 1959 Presidential Proclamation in which a quota was imposed on certain flatware 'wholly of metal and in chief value of stainless steel,' provided for under a then-existing paragraph of the Tariff Act of 1930. * * * *This and other temporary 'escape-clause actions' or modifications were incorporated into the Appendix of the TSUS. * * * "* [Emphasis added.]

11. See *Tariff Classification Study Submitting Report* (November 15, 1960), page 2.